IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 13, 2014

**STATE OF TENNESSEE v. KWAKU ARYEL OKRAKU**

**Appeal from the Criminal Court for Davidson County**
**No. 2009A769      Steve R. Dozier, Judge**

---

**No. M2013-01379-CCA-R3-CD - Filed August 1, 2014**

---

The defendant, Kwaku Aryel Okraku, was convicted of one count of aggravated child neglect where the neglect caused serious bodily injury to the child, a Class A felony, one count of aggravated child neglect where a controlled substance was used to accomplish the neglect, a Class A felony, and one count of reckless homicide, a Class D felony. He received a sentence of sixty years for each conviction of aggravated child neglect and a twelve-year sentence for reckless homicide, all to be served concurrently, for an effective sentence of sixty years. On appeal, the defendant argues that the trial court erred in denying his motion for judgment of acquittal because the evidence is insufficient to support his convictions; the trial court erred in permitting the jury to hear testimony regarding a prior incident involving drugs; and the trial court erred in permitting testimony about the defendant's statements about selling cocaine. After reviewing the record, we affirm the judgments of the trial court but remand the case for entry of a corrected judgment sheet that reflects the merger of the aggravated child neglect convictions, with aggravated child neglect through the use of a controlled substance remaining as the sole conviction for aggravated child neglect.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

William E. Griffith, Nashville, Tennessee, for the appellant, Kwaku Aryel Okraku.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel;

Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from an incident that occurred on June 11, 2008, where the victim ingested an amount of cocaine that ultimately proved fatal. Both the defendant and the victim's mother, Ms. LaTonya Majors, were subsequently indicted on two counts of aggravated child neglect and one count of first-degree felony murder. The defendant's first trial resulted in a mistrial. The facts included in this opinion are based upon the evidence presented at the defendant's second trial, where a jury found the defendant guilty of two counts of aggravated child neglect and one count of reckless homicide.

The victim was born on May 20, 2005, and was three years old at the time of the incident. The victim and her mother shared a townhouse with the defendant in Antioch, Tennessee. Ms. Majors and the defendant met shortly after the victim's birth, and the defendant was "basically [the victim's] father." On the morning of June 11, 2008, Ms. Majors and the victim went to a career center in Murfreesboro and then met Mr. William Gibson at Taco Bell. During the visit to the career center and Taco Bell, the victim was never out of Ms. Majors' sight. The victim and Ms. Majors later went to Eastland Park, where Mr. Gibson joined them in the afternoon. While at the park, the victim was never out of the sight of Ms. Majors other than "a normal . . . range" for a child playing in the park, and Ms. Majors never witnessed the victim pick up or handle any unknown objects or substances.

The victim and Ms. Majors returned from the park around 3:00 p.m. that afternoon, and Ms. Majors began to prepare dinner and get dressed to attend her cosmetology class, which began at 4:30 p.m. The defendant ordinarily cared for the victim while her mother attended class, but Ms. Majors wished for her friend Ms. Aniesha Ollie to watch the victim that day. Ms. Majors and the defendant had gotten into an argument the previous day, and she was still upset with the defendant.

Ms. Majors left her home "after 5:00 [p.m.]" to take the victim to Ms. Ollie's house. While en route to Ms. Ollie's residence, Ms. Majors broke her phone after she and the defendant got into another argument. Ms. Ollie was not home, so Ms. Majors went to one of her friend's residences, and Ms. Ollie was not there either. Ms. Majors then went to a Verizon store to replace her phone, and she telephoned the defendant to ask him to meet her at the store because the phone account was registered in his name. She purchased a new cell

2

phone, and she and the defendant returned to their residence in separate cars. The victim remained in the vehicle while Ms. Majors looked for Ms. Ollie and while Ms. Majors was purchasing a new cell phone. Ms. Majors never witnessed the victim pick up any objects during this time period.

Once Ms. Majors and the victim returned home, the victim "continue[d] to play throughout the house as she normally [did][][,]" and Ms. Majors laid down in her bedroom and began watching television. The defendant was not at the residence when Ms. Majors returned, but she estimated that she next saw the defendant "a few minutes" after she arrived home. The defendant "was in for a brief second" and then left shortly thereafter, stating that he was going to his mother's house. Ms. Majors stated that the victim was back at home for "about 45 minutes to an hour" before she collapsed.

There were no areas of the house that were off-limits to the victim, and Ms. Majors was not worried about the victim's getting into anything harmful in the house because the cleaning supplies were located in the laundry room and were placed high enough that the victim could not access them. When the victim was playing in the house, Ms. Majors was not able to see the victim nor was Ms. Majors aware of which specific rooms the victim entered.

Ms. Majors was on the telephone with Mr. Gibson when the victim entered her room and stood in the doorway and began to pray, stating either "I see Jesus" or "I'm talking to Jesus." Ms. Majors knew the victim was praying because the victim held both of her hands together "in a praying position" in front of her mouth. Ms. Majors found this behavior unusual because she had never noticed her daughter praying before. The victim also was ignoring Ms. Majors' attempts to speak with her, which was unusual because normally when Ms. Majors would speak to the victim, "she would respond no matter what she was doing." The victim also began to name "everyone she [knew] and wouldn't stop."

Ms. Majors observed this behavior for "probably about at the most 15 to 20 minutes." Because she had never witnessed the victim behave in this manner, Ms. Majors took a video of the victim on her cell phone. When the defendant returned home, Ms. Majors took the victim downstairs to show the defendant her behavior. The defendant told Ms. Majors that he had never witnessed the victim behaving in such a manner, and while he was holding the victim, she "collapsed." Ms. Majors estimated that the defendant returned home "probably within 5 or 10 minutes" of her taking the video of the victim and that "[p]robably 20 to 30 minutes" elapsed between the time when she first observed the victim praying to the time when the victim collapsed in the defendant's arms.

When the victim collapsed, Ms. Majors observed her eyes "rolling[,]" and the victim

3

"went limp." Ms. Majors grabbed the victim in her arms and exited the townhouse screaming for help. A neighbor made Ms. Majors lay the victim on the floor, and the victim began shaking.

Ms. Amanda Swift was a neighbor who witnessed Ms. Majors outside with the victim screaming that the victim was not breathing. Ms. Swift ran down her stairs and out of her door and asked Ms. Majors what was happening. When Ms. Majors responded that her daughter was not breathing, Ms. Swift took the victim from Ms. Majors, brought her inside of Ms. Majors' home, instructed Ms. Majors to call 911, and began to perform cardiopulmonary resuscitation ("CPR")on the victim. Ms. Swift stated that the victim urinated on her and at the time was "really clammy, sort of wet." Ms. Swift was certified and licensed to administer CPR and began to perform CPR when she found that the victim was not breathing. Ms. Swift noted that the victim's body was in a sort of "convulsion" and that the victim felt stiff, "like an ironing board."

The victim began to breathe on her own, but the breathing was not consistent enough for Ms. Swift to stop performing CPR. Ms. Swift detected a very faint pulse in the victim and estimated that she performed CPR on the victim for twenty to thirty minutes. Ms. Swift stopped performing CPR after hearing from the defendant that the 911 operator instructed them to stop all CPR efforts because it was believed that the victim was having a seizure. After stopping CPR, Ms. Swift observed the victim "going in and out of convulsions. She would shake; her eyes would roll in the back of her head and her body would constrict [sic]."

Mr. Anthony Bryant, a paramedic with the Nashville Fire Department, responded to the 911 call that came from the townhome. Mr. Bryant was dispatched to the residence at 10:30 p.m. and arrived at 10:41 p.m. Mr. Bryant believed that he was responding to a seizure, and, when he observed the victim, she "was seizing and was just twitching pretty much all over. . . . [her] [e]xtremities, body, head, eyes were twitching." The victim was placed on a stretcher, and Mr. Bryant began asking Ms. Majors about the victim's medical history. Ms. Majors told Mr. Bryant that the victim had a fever that day but that she had not given the victim any Tylenol or ibuprofen. She had given the victim Dimetapp earlier in the evening when she noticed that the victim felt hot. The victim went into cardiac arrest before leaving in the ambulance, and paramedics were not able to revive her until they arrived at Southern Hills Hospital. En route to the hospital, paramedics administered epinephrine to the victim to help her heart start beating again and atropine to help speed up the heartbeat to maintain blood flow. Mr. Bryant administered two dosages of each drug to the victim. At this point, Mr. Bryant believed that the victim was suffering from a febrile seizure.

After the victim arrived at Southern Hills Hospital, doctors were able to start the victim's heart beating again. Mr. Bryant then transported the victim to Vanderbilt Children's

4

Hospital after about "20 or 30 minutes." Mr. Bryant agreed that nothing about the victim's behavior was inconsistent with the victim's having suffered a cocaine overdose that day.

Officer Matthew Barnes of the Metro Police Department was initially dispatched to the residence, but, after learning that the victim was being transported to Southern Hills, he proceeded to the hospital. At the hospital, Officer Barnes spoke with the defendant and observed that he was visibly upset. Officer Barnes began filling out a report and later apprised a youth services detective about the situation.

Once the victim arrived at Vanderbilt Children's Hospital, doctors informed Ms. Majors that the victim was nearly unresponsive. Ms. Majors then learned on June 13, 2008, that the victim had cocaine in her system and that the cocaine was the cause of her unusual behavior. Upon learning that the victim had tested positive for cocaine, Ms. Majors "freaked out" on the defendant, shouting at him and telling him that she hated him.

Ms. Majors became upset with the defendant based upon a December 2006 incident, where Ms. Majors found the victim playing with a bag in her mouth in a closet in the room that Ms. Majors shared with the defendant. The bag was small and appeared to have been torn off and tied, and Ms. Majors observed two "rocks" inside the bag that were dark yellow. Ms. Majors confronted the defendant about the bag when he returned home, and the defendant told her that the bag contained "rat poison." Ms. Majors did not believe the defendant and kept asking him about the substance in the bag, at which point the defendant told her that she "kn[e]w what it [was] and just kind of gave a smirk." Although the defendant did not specifically tell her what the substance was, Ms. Majors surmised that the bag contained rock cocaine. She believed it was cocaine partially because she knew that rat poison looked "like a green little pellet" and because the items in the bag did not match that description, nor were there rats in the residence. The defendant eventually left with the bag and told Ms. Majors that he had been holding it for a friend.

Police were called to the residence in December 2006, and Ms. Majors did not make any mention of the drugs in the residence. She did not mention the drugs to the police because the defendant had already left with the drugs, and Ms. Majors was afraid that she would go to jail because she struck the defendant during the dispute. Ms. Majors informed the defendant that she would not tolerate drugs in the house, and the defendant promised that drugs would not be in the house again. Ms. Majors later informed detectives about the December 2006 incident after cocaine was discovered in the victim's system.

The morning after discovering that the victim tested positive for cocaine, Ms. Majors had a conversation with the defendant at their home where they discussed how the victim could have tested positive for cocaine. The defendant told Ms. Majors that the victim

5

possibly could have gotten the cocaine from a ball cap because the defendant had "cooked some up" in the microwave the night that the victim collapsed. He said that some of "it" may have gotten onto the cap. The defendant asked Ms. Majors if the victim had been playing with any of his hats, and Ms. Majors replied that she had, that she "always plays with all of his caps." Ms. Majors was not aware that the defendant had been cooking anything in the microwave on the night of the incident, and, although the defendant did not say what he had been cooking, it was insinuated to Ms. Majors that it was cocaine because the disclosure came during a conversation about how cocaine could have entered the victim's system. That same day, Ms. Majors relayed the details of this conversation to police officers and also informed them of the December 2006 incident.

Ms. Majors described the conversation between herself and the defendant as "sarcasm, but at the same time it was [the defendant] saying that he was doing it." The defendant informed Ms. Majors that he discovered a hat with powder on it, and Ms. Majors saw the hat and observed that it had a white powder. The defendant stated that he was "back at it," meaning that he was selling drugs again. Ms. Majors agreed that she never observed any large amounts of cash or digital scales or other drug paraphernalia in the townhouse.

Ms. Rebecca Swift[1] testified that she was a social worker in the pediatric critical care unit at Vanderbilt Children's Hospital in June of 2008. The day after the victim was admitted to the hospital, Rebecca met with Ms. Majors, the victim's biological father, and the defendant. Ms. Majors told Rebecca about the victim's strange behavior and showed Rebecca the video of the victim's praying. On June 13, 2008, Rebecca found out that the victim tested positive for cocaine and made a referral to the Department of Children's Services ("DCS"). Ms. Majors became "irate" when Rebecca informed her that she had contacted DCS, and Ms. Majors asked to speak with the defendant. Rebecca heard Ms. Majors scream at the defendant that cocaine was found in the victim's system and that she hated the defendant. Upon hearing that the victim tested positive for cocaine, the defendant "threw his arms up, [and he] said the F word." The defendant again used the "F word" when Rebecca informed him that she contacted DCS and the police. After meeting with Ms. Majors and the defendant, Rebecca contacted Detective Thomas Rollins and advised him of Ms. Majors' and the defendant's reaction to the news.

Dr. John Davis, a forensic pathologist and assistant medical examiner at Forensic Medical, did not perform the autopsy of the victim but testified that he agreed with the findings of the doctor who did perform the autopsy. He agreed that the victim's cause of death was the toxic effects of cocaine. He agreed that the symptoms displayed by the victim

---

[1]Ms. Rebecca Swift is not related to Ms. Amanda Swift. We will refer to Ms. Rebecca Swift as "Rebecca" so as to avoid any confusion. We intend no disrespect.

were consistent with a finding that the victim was experiencing some form of cocaine reaction and ingestion. Dr. Davis also agreed that there was no other potential cause of the victim's death. He stated that there was no way to determine how the cocaine entered the victim's system.

Dr. Donna Seger, the Medical Director of the Tennessee Poison Center, testified that the hospital first became aware that the victim had cocaine in her system after a urine drug screen tested positive for cocaine. Dr. Seger stated that the drug screen indicating the presence of cocaine was confirmed analytically by using "the gold standard, which is a big machine . . . kind of like a machine that doesn't make mistakes." Dr. Seger further testified that the symptoms the victim exhibited would be consistent with those displayed by a child who ingested cocaine. She opined that cocaine is rapidly absorbed into the body and that "the highest level of cocaine occurs very shortly after you ingest it, certainly within an hour." She testified that seizures occur quickly after a peak level of cocaine is reached. Dr. Seger said that administering atropine and epinephrine to the victim did not contribute to the condition that caused the victim's death, and she agreed that the medical explanation for the victim's death was cocaine ingestion that produced seizures that led to the brain death of the victim. Dr. Seger thought that the victim must have ingested cocaine because she did not believe that a three-year-old was capable of snorting something up her nose without assistance.

Ms. Aniesha Ollie testified that Ms. Majors was her best friend. She shared childcare responsibilities with Ms. Majors; Ms. Majors would look after her children when Ms. Ollie could not find a babysitter, and Ms. Ollie would do the same for Ms. Majors. Ms. Ollie did not have any contact with the victim on the day that she was admitted to the hospital. She testified that she had sold marijuana but stated that she never brought drugs into Ms. Majors' residence.

Mr. Robert Cross testified that he met the defendant while both were incarcerated at the Criminal Justice Center ("CJC"). The defendant approached Mr. Cross for legal advice several days after the defendant entered the CJC because he witnessed Mr. Cross preparing legal letters for other inmates. The two spoke on several occasions, and other inmates were not within hearing distance. Mr. Cross testified that the defendant told him that the defendant had laid cocaine out on a table and that he was "bagging it up for resale." The defendant went to use the bathroom, and when the defendant returned from the bathroom, he saw the victim with white residue on her hand and told Mr. Cross that she later collapsed. The defendant also "mentioned something" to Mr. Cross about cooking something in a microwave. The defendant told Mr. Cross that the child was his girlfriend's daughter and mentioned that his girlfriend had also been charged in her murder. The defendant was afraid that his girlfriend would later testify against him, and his plan was to place much of the

7

blame on her if she did testify against him. The defendant mentioned that he was experiencing financial difficulties and said that he was reselling cocaine in an attempt to make more money. The defendant referenced the fact that a detective found "30 something pairs of tennis shoes" and "high priced rims," and he was worried that these items would make it appear as though he was a drug dealer.

Mr. Cross made notations on several different dates about his conversations with the defendant, and these notes were discovered during a security shakedown. The information was turned over to authorities, and Detective Thomas Rollins interviewed Mr. Cross about the letter. Before conducting the interview, Detective Rollins confirmed that the defendant and Mr. Cross were housed in the same location in the CJC. Detective Rollins showed Mr. Cross a set of photographs, and Mr. Cross identified the defendant as the individual with whom he had spoken. Detective Rollins agreed that he and Mr. Cross discussed the items found in the defendant's residence and that Mr. Cross indicated that his knowledge of these items came from conversations with the defendant.

On cross-examination, Mr. Cross admitted that his notes did not contain any reference to the victim's having cocaine on her hands or later passing out. He agreed that his notes said that the cocaine was on the victim's lips. He never mentioned the defendant's cooking something in the microwave in his notes or interview and testified that he did not remember until trial that the defendant stated that he cooked something in the microwave. He attributed his memory struggles to the length of time elapsing between his testimony at trial and his pretrial conversations with both the defendant and Detective Rollins. Mr. Cross admitted that he hoped speaking with authorities would result in a reduction of his sentence but testified that he did not receive an early release for cooperating with authorities.

Detective Thomas Rollins of the Metro Nashville Police Department Youth Services Division first spoke with Ms. Majors and the defendant at Vanderbilt Children's Hospital on June 12, 2008. Once he learned that the victim tested positive for cocaine, he re-interviewed Ms. Majors. Ms. Majors informed Detective Rollins that the defendant was the one responsible for the cocaine that was found in the victim's system and told him that the defendant had been cooking something inside the residence. Detective Rollins then conducted a telephone interview with the defendant, who told the detective that he had no idea how the cocaine got into the victim's system. Both Ms. Majors and the defendant were aware that the victim tested positive for cocaine before speaking with Detective Rollins.

Based upon his conversation with Ms. Majors, Detective Rollins conducted a search of the defendant's townhome. He discovered two red Chicago Bulls baseball caps, which contained no visible residue and could not be tested by the TBI. Detective Rollins observed "quite a few" pairs of expensive tennis shoes, along with "upper end electronics and rims for

8

[the defendant's] vehicle" during the search. Detective Rollins did not find any drugs in the residence, but he was aware that the defendant and Ms. Majors were suffering financial difficulties. Detective Rollins had previously investigated narcotics crimes, and he testified that crack cocaine typically is a "yellowish color" and that "rock" is a commonly-used street term to describe crack cocaine. He further testified that crack cocaine could "very easily" be cooked in a microwave.

Detective Rollins was able to listen to several telephone conversations that the defendant had made while incarcerated when the defendant spoke with his brothers and also with Ms. Ollie. Detective Rollins noted that the defendant expressed concern that Ms. Majors was going to "flip" and cooperate with detectives. Ms. Ollie would be included on three-way telephone calls when the defendant and his brothers would attempt to find out how Ms. Majors was doing and state that they were going to hire Ms. Majors a private attorney. As soon as Ms. Ollie would exit the conversations, the defendant and his brothers would "start talking bad about her" and express that Ms. Ollie was not on their side. Detective Rollins believed that the primary aim of these conversations was to "keep Ms. Majors quiet" and prevent her from testifying against the defendant. The defendant was concerned because he had been in a relationship with Ms. Majors for three years, and she knew "a lot about his business." At one point, the defendant stated that he did not think that Ms. Majors would tell police that he left drugs behind at the house.

The defendant testified that he was employed by Southwestern Great American at the time of the incident. He recalled the December 2006 incident, and he stated that the substance that Ms. Majors discovered was mothballs that the defendant was using to keep ants out of the house. When Ms. Majors did not believe the substance was mothballs, the defendant told her that it was poison meant to get rid of ants. The defendant stated that a fight occurred because Ms. Majors believed that he was breaking up with her, and she did not want him to do so. He stated that the first time he heard that Ms. Majors was alleging that drugs were involved in that dispute was after he was incarcerated. He denied that the substance was narcotics, stating that he did not have any drugs in his closet for the victim to find.

The defendant testified that the couple "had financial problems like everybody else would." He said that he enjoyed collecting tennis shoes and would use any extra money he made to purchase a pair of sneakers. He stated that he received a loan to purchase both his vehicle and the rims on the tires.

The defendant's account of June 11, 2008, and the following days differed somewhat from the testimony of Ms. Majors. The defendant recalled that, on the morning of the incident, Ms. Majors and the victim left the residence without informing him where they

were going. Ms. Majors later sent the defendant a text message telling him that she was at the career center in Murfreesboro and asking him if he could watch the victim later in the day while Ms. Majors attended class. Ms. Majors did not tell the defendant that she went to the park. Ms. Majors and the victim returned to the residence around 3:00 p.m., and the defendant recalled the victim's complaining that she had a headache. He came downstairs and saw the victim sitting at the table preparing to eat dinner. Ms. Majors and the victim left after Ms. Majors and the defendant got into an argument.

The defendant testified that he did not meet Ms. Majors at the Verizon store; she returned to the townhome and picked him up to go with her to the Verizon store. Ms. Majors dropped the defendant back off at the townhome, where he remained playing video games. He left the residence later in the evening to go to his parents' house and returned thirty or forty-five minutes later, at which point "everything went haywire."

Ms. Majors brought the victim downstairs to say goodnight to the defendant, and the defendant noticed that something seemed wrong with the victim. He asked Ms. Majors about it, and Ms. Majors informed him that the victim had been acting strange for the last thirty or forty-five minutes while the defendant was away. Ms. Majors went to pick the victim up, and the victim "stumbled, hit the wall and slid down, eyes rolling in the back of her head." The defendant then called 911 and was relaying to Ms. Majors and Ms. Swift the information he was receiving from the 911 dispatcher. When the ambulance arrived to transport the victim, the defendant attempted to get in the ambulance, but the ambulance had already started to pull away. The defendant rode to the hospital with his older brother.

The defendant testified that while at Vanderbilt Children's Hospital, he was called to a small room where Ms. Majors began shouting that she hated him. One of the doctors then explained that the victim tested positive for cocaine, and the first word out of the defendant's mouth was "[t]he F word." He cursed because he was confused as to how a three-year-old could have cocaine in her system. The defendant was very upset when he heard this news.

The defendant recalled that he did not argue with Ms. Majors at the townhome when discussing how cocaine could have entered the victim's system and testified that he never said anything about the victim's potentially coming into contact with a powdered substance on one of his baseball caps. He testified that he never stated that he was cooking something in the microwave on the night of the incident. He recalled that he kept his hats on the top shelf of a closet and that the victim would have been unable to reach them.

The defendant recalled that, on the day of the discussion in the townhome, Ms. Majors told him not to return to the hospital. When he came back to the townhome, he saw that the home and his truck had been searched.

When the defendant learned that there was a warrant out for his arrest, he eventually turned himself in to authorities. While in jail, he was informed that Mr. Cross was an inmate who was familiar with the law, and the defendant approached him to try to learn more about what he was charged with and the basis for the charges. He stated that he never witnessed Mr. Cross writing letters or any other paperwork, and he estimated that he spoke with Mr. Cross on "anywhere from 10 to 15 occasions." The defendant told Mr. Cross about the police's search of his residence and vehicle but testified that he never mentioned anything about bagging up drugs for resale and never told Mr. Cross that the victim had cocaine on her lips and passed out.

The defendant said that he told Mr. Cross that police searched his home because his daughter had cocaine in her system and had determined that she could not have ingested it anywhere other than at the defendant's residence. He claimed that Mr. Cross fabricated the idea that the defendant was experiencing financial difficulty and resorted to selling drugs to earn extra money. The defendant believed that Detective Rollins thought that he was a drug dealer based upon his collection of sneakers and other items found in his residence. The defendant claimed that the majority of items in his residence were purchased used and second-hand at garage sales. The defendant testified that he never had cocaine in his residence on June 11, 2008, and that he still was unsure how the cocaine entered the victim's system.

He used the "F word" when he learned about the cocaine in the victim's system because it "was the first thing that came to mind[,]" as the positive test reflected negatively on both Ms. Majors and him as parents. The defendant agreed that he had never witnessed Ms. Majors use drugs but stated that the two never had a conversation about having drugs in the home. He contended that Ms. Majors' testimony was "probably" untrue and claimed that Mr. Cross made up "everything that he said." The defendant stated that Ms. Majors made up her statement that the defendant admitted that the substance from the December 2006 incident was cocaine and fabricated the conversation in the bathroom between the two of them the day after the victim tested positive for cocaine. The defendant agreed that Ms. Majors did not have very much knowledge about how drugs are packaged or cooked and then agreed that she fabricated a story about how cocaine entered the victim's system.

The jury convicted the defendant of two counts of aggravated child neglect and one count of reckless homicide, and he received an effective sentence of sixty years. The defendant filed a pro se petition for post-conviction relief alleging several grounds of ineffective assistance of counsel and was permitted to file a delayed appeal because trial counsel failed to file a motion for new trial or a notice of appeal. The trial court then denied the defendant's motion for a new trial, and he filed this timely appeal.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The defendant argues that the trial court erred in denying his motion for acquittal filed after the State rested its case because the evidence was insufficient to sustain his convictions for aggravated child neglect and reckless homicide. Specifically, he contends that witnesses provided inconsistent testimony and that the evidence is insufficient to show that he exposed the victim to cocaine and therefore also insufficient to show that he neglected the victim "as to affect her health and welfare causing her serious bodily injury."

A defendant waives his right on appeal to challenge the trial court's failure to grant a midtrial motion for judgment of acquittal if the defendant chooses to present proof after the trial court denies the motion. *State v. Collier*, 411 S.W.3d 886, 893 (Tenn. 2013) (citing *Mathis v. State*, 590 S.W.2d 449, 453 (Tenn. 1979)). Here, the defendant chose to testify after the trial court denied his motion, and he did not renew the motion at the conclusion of the evidence. Therefore, this issue is waived on appeal, and we only address whether the evidence is sufficient to support the defendant's convictions. *See Collier*, 411 S.W.3d at 893.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after reviewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Circumstantial evidence alone may be sufficient to support a verdict of guilty. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). It is the jury who "decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and [,moreover,] the extent to which circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). Direct and circumstantial evidence

are treated equally when weighing the sufficiency of the evidence, and it is not required for the State to exclude every reasonable hypothesis except for that of guilt. *Id.* at 381.

A person commits the offense of aggravated child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare," and "[t]he act of abuse, neglect, or endangerment results in serious bodily injury to the child." T.C.A. §§ 39-15-401(b); 39-15-402(a)(1) (2012). A person also commits aggravated child neglect if "a controlled substance . . . is used to accomplish the act of abuse, neglect or endangerment. T.C.A. § 39-15-402(a)(2). The defendant was convicted of two alternative counts of aggravated child neglect. Count 1 alleged serious bodily injury, and Count 2 alleged that a controlled substance was the instrument that accomplished the neglect. When the child is eight years old or younger, the offense is a Class A felony. T.C.A. § 39-15-402(b). A person acts "knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). Serious bodily injury is defined as bodily injury that involves:

> (A) A substantial risk of death
> (B) Protracted unconsciousness
> (C) Extreme physical pain
> (D) Protracted or obvious disfigurement
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty; or
> (F) A broken bone of a child who is eight (8) years of age or less[.]

T.C.A. § 39-11-106(a)(34)(A)-(F). In order to sustain a conviction for child neglect, the State must prove "three material elements: (1) that a person knowingly neglected a child; (2) that the child's age was within the applicable range set forth in the statute; and (3) that the neglect adversely affected the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 670 (Tenn. 2001). The State must also prove that the child suffered "an actual, deleterious effect or harm." *Id.* at 671.

A person commits reckless homicide by recklessly killing another. T.C.A. § 39-13-215(a). The statute states that:

> "Reckless" refers to a person who acts recklessly with respect to the circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard

13

constitutes gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(c). Viewed in the light most favorable to the State, the evidence shows that on June 11, 2008, the defendant brought cocaine into his residence. He was preparing the cocaine for resale, and some of the cocaine came to rest on one of his baseball caps. The victim was able to access the cocaine, ingested it, and began exhibiting strange behavior that necessitated a 911 call. The victim later passed away, and toxicity from cocaine ingestion was determined to be the cause of her death. The presence of cocaine in the victim's system was confirmed by two separate tests. Dr. Davis and Dr. Seger both testified that the victim died due to cocaine ingestion. Ms. Majors testified that the defendant told her that he had been "cooking some up" in the microwave the night of the incident and that the victim may have ingested cocaine from one of his baseball caps. Ms. Majors testified that she saw a baseball cap belonging to the victim that contained a white powder. Ms. Majors also testified to an incident that occurred in December of 2006, where she discovered the victim with a bag in her mouth that contained what Ms. Majors believed was rock cocaine. Mr. Cross testified that the defendant told him that he was bagging up cocaine for resale and that he witnessed white powder on the victim's hands.

The defendant contends that there was no proof that he brought cocaine into the residence, and he claims that the testimonies of Ms. Majors and Mr. Cross were "inconsistent at best." However, the jury chose to credit the testimonies of Ms. Majors and Mr. Cross over the testimony of the defendant. It is the jury who resolves questions of witness credibility, and this court will not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." *Bland*, 958 S.W.2d at 659. We conclude that the evidence is sufficient to support the defendant's convictions for aggravated child neglect and reckless homicide. From the proof at trial, a jury could find that the defendant brought cocaine into his residence knowing that the victim was able to access it; the victim was three years old at the time, within the age requirement enumerated by the statute; and the defendant's actions caused the victim to ingest cocaine, which resulted in her death. The evidence shows that the defendant's act of neglect resulted in serious bodily harm to the victim and that a controlled substance was used to accomplish the neglect. Accordingly, the defendant is not entitled to any relief as to this issue.

## II. Prior Bad Acts

### A. Testimony Regarding the December 2006 Incident

The defendant argues that the trial court erred by admitting testimony regarding the

2006 incident when the victim placed a bag into her mouth that contained rock cocaine. Specifically, he claims that the testimony constituted improper character evidence whose probative value was outweighed by the danger of unfair prejudice.

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as illustrating motive, intent, guilty knowledge, the identity of the defendant, absence of mistake or accident, and common scheme or plan. *Id.*; *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975). In order to admit evidence of a prior bad act:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Our standard of review of the trial court's determinations under Tennessee Rule of Evidence 404(b) is whether the trial court's ruling was an abuse of discretion. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). However, this decision is entitled to deference only if the trial court substantially complied with the procedural requirements of Rule 404(b). *Id.*

The defendant contends that the probative value of the evidence was outweighed by the unfair prejudice and that the incident was not proven by clear and convincing evidence. Before trial counsel began cross-examination of Ms. Majors, but after she recounted the December 2006 incident, the trial court gave the following limiting instruction to the jury:

> If from the proof you find that the defendant has committed another crime -- you've heard what this witness has talked about in terms of what she thought were drugs, et cetera. That, obviously, is not what he is, [the defendant] is, on trial for at this point.
>
> And that information, if you credit it at all, may not be considered as evidence to prove his disposition to commit a crime for

15

that which he is on trial for. This evidence may only be considered by you, if at all, for the limited purpose of determining whether it provides, A, the defendant's intent. That is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged or,

B, guilty knowledge. That is, such evidence may be considered by you where guilty knowledge is an essential element of a crime charged and evidence of other offenses tends to establish that the defendant possessed of this knowledge at the time of the commission of the alleged crime with which he is presently charged with.

The trial court then conducted a hearing outside the presence of the jury. The court discussed the admissibility of the December 2006 incident in conjunction with the defendant's statement to Ms. Majors that he may have been responsible for providing the cocaine that the victim ingested, stating:

But the statement she's talking about [the defendant] making bear on June 12th obviously is relative, probative again of all the other issues that we discussed or for the last trial and this trial and were just instructed in terms of limiting instructions to the jury, that is, I mean, does the defendant -- if believed, obviously, but that's the jury's role, not mine -- there's been no proof to the contrary here.

But if believed, does this information contained in this statement come back at it again using there is no testimony here like there was at the last trial where [the defendant] said anything about dealing, but his having access to that substance and his acknowledgment of that to Ms. Majors, which I do find has been shown here, and ease [sic] central element -- can it be an element of this particular charge?

That is that by doing this; coupling it with the December of '06 about being back at it again is that aggravated child neglect based on the age and circumstances around this incident. I think it is so were [sic] not here trying [the defendant] on simple possession of cocaine but if he's acknowledging I'm back doing it again, using, then I think that's probative and not unfairly prejudicial because the whole crux of the case.

And the reason for it is not, am I guilty of simple possession, but am I guilty of possessing [cocaine] for resale or use around this three-year-old child

16

having the information again, if believed, from the December of '06 incident.

Trial counsel then had the following discussion with the trial court:

> Trial Counsel: Judge, just for the record. . . . And so in your ruling just now you talk about coupling the fact relating back to the December of 2006 incident?
> The Court: Uh-huh.
> Trial Counsel: Which is exactly why when I was making -- when I was making my motion again today at the start of the trial asking that -- for that to stay out when she testified to that a few minutes ago, there was nothing except for her saying, I assume it to be -- there is nothing saying that is, in fact, what the substance was.
> The Court: Yeah, I mean, there's no lab report.
> Trial Counsel: Well, there's no lab report. She never mentioned anybody until this incident.
> The Court: I understand that. And you can cross-examine her about it. But I mean, if [the jury] believe[s] [Ms. Majors] there was an incident about rat poisoning, little white rocks tied up in a plastic bag, and whether that was rat poisoning or cocaine.
>
> I mean, it puts -- if believed -- puts [the defendant] on notice that, hey, don't leave white rocks laying around in little plastic bags for [the victim] to have access to.
>
> . . . .
>
> So, I mean, they have a discussion about, hey -- a fight about, hey, don't have [the victim] around stuff like this, don't bring it into the house, and then June of '08 that's what occurs again. Again, if believed.

We conclude that the trial court substantially complied with the procedural requirements of Rule 404(b). The court conducted a jury-out hearing and determined that a material issue other than conduct conforming with a character trait existed; the act was relevant to show either the defendant's intent or guilty knowledge and served to put the defendant on notice that leaving cocaine accessible to the victim could have a harmful result. The court determined that the probative value was not outweighed by the danger of unfair prejudice. While the record before us does not contain an explicit statement from the court that it found proof of the December 2006 incident by clear and convincing evidence, the court considered the December 2006 incident in conjunction with the defendant's statements to Ms. Majors. The court found that proof of the defendant's acknowledgment to Ms. Majors that he had

access to cocaine "has been shown here[.]" The court recognized that a lab report did not exist confirming that the substance from December of 2006 was cocaine but permitted trial counsel to cross-examine Ms. Majors about the incident. In so doing, the court implicitly extended its finding that Ms. Majors's testimony constituted proof of the defendant's statements to also find that her testimony regarding the December 2006 incident showed that the substance from the incident was cocaine. *See State v. Michael Bailey*, No. W2005-01815-CCA-R3-CD, 2007 WL 763212, at *5 (Tenn. Crim. App. Mar. 13, 2007) (concluding trial court substantially complied with Rule 404(b) when it did not explicitly find proof that a prior bad act occurred by clear and convincing evidence but that the finding was implicit in the court's explanation for permitting the testimony of the witness). Because the trial court substantially complied with the procedural requirements of Rule 404(b), we review the decision for an abuse of discretion. *Dubose*, 953 S.W.2d at 652.

We conclude that the trial court did not abuse its discretion in admitting testimony regarding the December 2006 incident. We agree that the evidence was material to an issue other than conformity with a character trait because it established the defendant's intent and guilty knowledge. While the evidence may have been prejudicial, it was also highly probative, and the probative value was not outweighed by the danger of unfair prejudice. The incident demonstrated that the defendant was on notice that the victim could access drugs that he kept in his residence. The incident was probative of the defendant's knowledge that the victim had previously come perilously close to ingesting cocaine that was in his residence. When coupled with his statements to Ms. Majors, the December 2006 incident showed the defendant's guilty knowledge that his conduct had caused the victim's injury. Further, the trial court provided a limiting instruction to the jury that the evidence of the December 2006 incident could only be considered to determine whether it proved the defendant's intent or guilty knowledge. Accordingly, the defendant is entitled to no relief as to this claim.

### B. Testimony of Robert Cross

The defendant argues that the trial court erred by admitting the testimony of Robert Cross regarding the defendant's statements that he had bagged up cocaine for resale on the date of the incident and that the victim had white powder on her lips. He specifically contends that the statement was inconsistent with his own testimony and that of Ms. Majors and that it constituted improper character evidence whose probative value was outweighed by the danger of unfair prejudice. The State responds that the testimony was not character evidence nor evidence of other crimes but that it was evidence of the crime of aggravated child neglect. We agree with the State and conclude that the evidence was not a prior bad act that required a 404(b) analysis. Bagging cocaine and leaving it on the table was the conduct that gave rise to the charges of aggravated child neglect and reckless homicide, the

conduct that was at issue in the trial; therefore, it was not a prior bad act.

Because the testimony did not constitute evidence of a "prior bad act" requiring a 404(b) analysis, the issue becomes whether the evidence was admissible under Rules 401 and 402. *Dubose*, 953 S.W.2d at 653. In order to be admissible, evidence must first be relevant. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. If the trial court finds that the evidence is relevant, the court must then determine "if the probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. Unfair prejudice exists when evidence has "[a]n undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). This court reviews evidentiary decisions of the trial court under an abuse of discretion standard. *Dubose* at 652.

Before Mr. Cross testified, the trial court conducted a hearing outside the presence of the jury. The trial court found that Mr. Cross's testimony was credible because there was written evidence of the statements the defendant made, and no proof had been offered to contradict Mr. Cross. The trial court found that the testimony was not unfairly prejudicial and was extremely probative, stating:

> So, these discussions about how this incident happened, I mean, obviously, if they're believed by the jury, they're extremely probative. No one else in the prior trial, at any other time has given information about the victim having a baggy and white powder on her hands. So it's extremely probative. Is it prejudicial to hear that I'm selling drugs out of a house where there is a three year old? Yes. Is it unfairly prejudicial? I don't think so because of the material issues that we've already discussed when I was ruling on Ms. Majors['] testimony.
>
> . . . .
>
> But back to the cocaine and I'm back into selling it and she gets a hold of some of it. I mean, the reason it's probative is it's an admission, number one, if it's believed. And Number two i[t] goes into multiple elements about knowledge and intent and can answer, if the jury believes it, they may think Mr. Cross is ridiculous, I don't know. But can explain the question that, again, has been asked and is a relevant question to be asked, is [the defendant] responsible for this. Well, is it neglectful to be selling drugs or leaving cocaine out in a home where a three year old is present and roaming around?

19

Might be, if the jury credits the testimony, and that's the whole case.

> So obviously there are issues again, other than character or other than is, was [the defendant] in June of '08 selling drugs. That's not what we're here to answer, but that is extremely relevant and probative to the allegations for which he's on trial for aggravated child neglect and did that lead to the victim's death.

In the case *sub judice*, the trial court determined that the testimony of Mr. Cross was highly probative as to the allegation of aggravated child neglect. The court found that the evidence raised issues other than the defendant's character and determined that it was not unfairly prejudicial because the evidence raised questions as to the defendant's intent and guilty knowledge.

We conclude that the trial court did not abuse its discretion in admitting the testimony of Mr. Cross. As the trial court noted, the testimony was highly probative as to the allegation that the defendant committed aggravated child neglect by leaving cocaine in a location where it was accessible to the victim. The evidence was probative of the defendant's intent to leave cocaine in a location where the victim could access it and to the defendant's guilty knowledge that it was his conduct that caused the victim's death. We agree that while the testimony was prejudicial, it was not unfairly prejudicial, and any prejudice did not substantially outweigh the probative value. Therefore, the defendant is not entitled to any relief on this issue.

## III. Merger

We note as a matter of plain error that the trial court entered two judgments of conviction for aggravated child neglect, but the defendant was convicted under alternative theories. In Count 1, the defendant was convicted of aggravated child neglect that caused serious bodily injury to the victim, and in Count 2 he was convicted of aggravated child neglect where a controlled substance was employed to accomplish the neglect. When a defendant is convicted of the same offense under alternative theories, "a merger and imposition of a single judgment of conviction protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed 'charges' or 'convictions.'" *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). Therefore, we vacate the judgments and remand the case for the entry of a single judgment form to reflect the merger of the aggravated child neglect conviction in Count 1 into the conviction of Count 2.

20

## CONCLUSION

For the above-mentioned reasons, the judgments of the trial court are affirmed, but the case is remanded for the entry of a single, corrected judgment form to reflect the merger of the verdicts into one conviction for aggravated child neglect, with Count 2 as the basis for the remaining conviction.

_____
JOHN EVERETT WILLIAMS, JUDGE